**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**TOM LINCOLN**,

    Plaintiff,

vs.                                                                                               Civ. No. 06-575 MCA/DJS

**STATE FARM FIRE AND CASUALTY CO.,**

    Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on *Defendant State Farm Fire and Casualty Company's Motion for Summary Judgment* [Doc. 32], filed April 2, 2007. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion.

**I. BACKGROUND**

Plaintiff Tom Lincoln was an insured of Defendant State Farm Fire and Casualty Company ("State Farm") when, on or about November 27, 2003, his home at 26 Shade Tree Lane, Tijeras, New Mexico, sustained damage from a water-pipe leak. The leaky pipe was part of the residence's radiant heat system and was located under the home's concrete slab. [See generally Doc. 1, attached *Complaint for Breach of Contract and Bad Faith Damages*]. Pursuant to the terms of his homeowner's policy, Mr. Lincoln carried "Replacement Cost Coverage." The policy section addressing "Replacement Cost Coverage" provides as follows:

> A1 - Replacement Cost Loss Settlement - Similar Construction is replaced with the following:
>
> a.  We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I - COVERAGES, COVERAGE A - DWELLING, except for wood fences, subject to the following:
> (1) we will pay replacement cost at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the Declarations, not to exceed the cost to repair or replace the damaged part of the property. . . .

[Doc. 33; Exh. A, "Amendatory Endorsement" ¶ A1].

It is undisputed that on January 6, 2004, Mr. Lincoln wrote to State Farm:

> Per the terms of the policy I will be submitting bills that I incurred to protect my property from further damage or loss. These bills add up to $1292.03. I will attach copies for your review.
>
> Per the terms of the policy I have attached an estimate from the contractor of my choice for repairing the slab, removing and replacing tile in foyer, kitchen and dining room as exact match cannot be made. The total estimate is $4,895.24. I will attach a copy for your review.
>
> Per the terms if my policy under section 1, coverage c: loss of use; Additional living expense: My home was uninhabitable, my agents assistant Robert Chavez called your claims office and verified to the sub freezing temperatures which makes my home uninhabitable. I requested an advance for additional living costs relating to this claim but I was denied by Mary? (sic) My deductible was already satisfied. A reasonable rate that I would have been entitled to would be $75.00 a day. Since it took 17 days for you to respond and at least 2 weeks to complete work on this covered loss that comes to 31 days total. 31 days times

> $75.00 a day comes to $2325.00.
>
> *Attached you will find a contract for an alternative heat system for $7800.00. That contract does not include the electrical work which I received a verbal bid from an electrical contractor for $600.00. Total cost $8400.00. My agent led me to believe that this cost would be covered as this would be much more cost effective to State Farm than putting me back with what I had. My agent further called me late in the evening of the 12th of December to go ahead and line up the alternative heat system contractor. State Farm should act in good faith and pay this or I will also pursue his errors and omissions. I am also aware and can produce a policyholder from State Farm who had an exact sa[m]e loss and State Farm paid for an alternative heating system.*
>
> Attached you will find the documentation for the damages in relation to claim # 31-B057-983. The damages total $16,912.27, less a $1,000.00 deductible.

[Doc. 33 at 2-3 (emphasis added)]. Mr. Lincoln did not through this letter request replacement of his radiant heating system. [Doc. 37; Exh. E, Nov. 10, 2006 depo. of Tom Lincoln at 45]. In a separate letter of the same date addressed to Doug Markwardt at State Farm's Operations Center, Mr. Lincoln explained, among other things, that he was instructed by his agent "to get the water leak fixed to prevent further property damage and we will deal with the rest later." [Doc. 33; Exh. B]. Mr. Lincoln did not through this letter mention a radiant heating system. [See id.].

On January 29, 2004, Mr. Lincoln spoke by telephone with State Farm Claim Representative Craig Cuthbert. Mr. Lincoln recorded the conversation. [Doc. 33; Exh. D, "Conversation 4 Tom & Craig"]. During that conversation, Mr. Cuthbert explained that State Farm was prepared to offer him $11,347.12, which sum represented Mr. Lincoln's total

3

expenses of $15,960.70, less his $1,000.00 deductible, less $3,613.58 already paid. [Id. at 7-8]. Mr. Cuthbert explained that Mr. Lincoln would be receiving two checks, one in the amount of $1,550.00 made payable to him alone and one in the amount of $9,797.12 made payable to both him and his mortgage company, because for "[a]ny claim over 7,500 bucks [State Farm was] required to include [the mortgage company] on the check." [Id. at 8]. Following Mr. Cuthbert's explanation, Mr. Lincoln stated, "*I will accept what you have said for everything[,]*" and before ending the conversation, confirmed that he was happy with State Farm. [Id. at 9, 13].

In a letter dated February 2, 2004, Mr. Cuthbert provided a written breakdown of State Farm's payment to Mr. Lincoln. The letter begins:

> RE:   Our Claim #:      31-B057-983
>       Date of Loss:     November 27, 2003
>       Type of Loss:     Water
>
> Dear Mr. Lincoln:
>
> This letter is in reference to the above-captioned claim. Enclosed are two drafts *in settlement of your claim*.

[Doc. 33; Exh. E, Feb. 2, 2004 letter from Craig Cuthbert to Tom Lincoln at 1 (emphasis added)]. The letter then gives a line-by-line explanation of the drafts, explains why two drafts are included, and closes with, "*Should you have any questions, please feel free to contact me. . . .*" [Id.]. Mr. Lincoln has acknowledged receipt of payment. [Doc. 33; Exh. H, Jan. 20, 2005 letter from Tom Lincoln to Chuck Brewer].

On July 22, 2004, Mr. Lincoln sold the property located at 26 Shade Tree Lane,

4

conveying it to purchaser Karen Ohlendorf-Prinke by warranty deed. [Doc. 33; Exh. G]. Six months later, on January 20, 2005, Mr. Lincoln sent a letter to State Farm representative Chuck Brewer "with hope of seeking final settlement and resolution through clarification and your assistance with regard to [Claim # 31-B057-983]." [Doc. 33; Exh. H]. While Mr. Lincoln "acknowledge[d] receipt of the reimbursement costs that were paid to [him], as [he] paid for the reasonable and necessary temporary repairs . . . performed on the damaged property[,]" he went on to explain that "[t]he reason [he] purchased insurance coverage [was] to protect [himself] from a catastrophic loss, as the one [he] incurred." [Id.]. He further explained that "[t]he cost that [he had] been quoted by a qualified licensed contractor to put [him] back the way [he] was would be in excess of $100,000.00." [Id.]. Mr. Lincoln contacted State Farm several times after January 20, 2005 to dispute that Claim # 31-B057-983 had been paid in full. [See Doc. 33; Exh. C. Cuthbert depo. at 92-93].

On May 23, 2006, Mr. Lincoln filed his *Complaint for Breach of Contract and Bad Faith Damages* against State Farm. [Doc. 1; attached *Complaint*]. State Farm removed the matter, then moved for summary judgment arguing, among other things, that Mr. Lincoln's claims are barred by the doctrine of accord and satisfaction. [Doc.1; Doc. 32; Doc. 33 at 9-11]. Mr. Lincoln responds, in pertinent part, that material factual issues exist as to whether he accepted State Farm's reimbursement for costs incurred in installing the forced air heating system in full satisfaction of the debt owed. [Doc. 37 at 4].

## II. ANALYSIS

### A. Summary Judgment Standard, Fed.R.Civ.P. 56

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e). Nor will unsupported conclusory allegations create a genuine issue of fact. Harrison v. Wahatoyas, L.L.C., 253 F.3d 552, 557 (10th Cir. 2001). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Judgment is appropriate as a matter of law if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See Celotex, 477 U.S. at 324. It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the

moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### B. The Doctrine of Accord and Satisfaction

To determine whether there was an accord and satisfaction here, this Court looks to state law. See United States v. Sackett, 114 F.3d 1050, 1052 (10th Cir. 1997). "An accord and satisfaction has been defined as '. . . a method of discharging a contract, or settling a cause of action arising either from a contract or a tort, by substituting for such contract or cause of action an agreement for the satisfaction thereof and the execution of such substituted agreement.'" Smith Const. Co. v. Knights of Columbus, Council No. 1226, 86 N.M. 50, 52 (1974) (*quoting* Frazier v. Ray, 29 N.M. 121, 123 (1923)). Additionally,

> [a]n accord and satisfaction must be accompanied by such acts or declarations as amount to a condition that if money is accepted, it is to be in full satisfaction; and the acts or declarations must be of such character that the party to whom the money is offered is bound to understand that, if he accepts the money, he accepts it subject to such conditions.

Gutierrez v. Sundancer Indian Jewelry, Inc., 117 N.M. 41, 44 (N.M.App. 1993) (*citing* Los Atrevidos v. Preferred Risk Life Ins. Co., 107 N.M. 217, 218 (1988)); see also Valley Asphalt, Inc. v. Stimpel Wiebelhaus Assocs., 3 Fed.Appx. 838, 839-840 (10th Cir. 2001) ("[t]he elements of accord and satisfaction are simple and clear. There must be: 1) a bona fide dispute over an unliquidated claim amount; 2) a check tendered in full settlement of the claimed amount; and 3) acceptance of the payment."). Because an accord and satisfaction

operates to extinguish, discharge, or terminate an existing right, an accord and satisfaction supersedes the original demand.  Bank United of Texas FSB v. United States, 49 Fed.Cl. 1, 3 (Fed.Cl. 1999); 1 GLENDA K. HARNAND, C.J.S. ACCORD AND SATISFACTION 64 (2008).

"As a matter of public policy . . . courts presume that when parties have settled a dispute they 'intended a complete accord and satisfaction of their respective claims against each other of [the facts underlying the explicitly settled dispute].'" Gutierrez, 117 N.M. at 51 (Hartz, J., dissenting) (*quoting* Bennett v. Kisluk, 112 N.M. 221, 223 (1991)).  Moreover, it is wholly permissible to conduct "an investigation into the surrounding circumstances" to determine whether the parties intended their agreement to constitute an accord and satisfaction.  See id. at 44.  In making this determination, it is important to remember that the assent to the offer, a requirement for the creation of any valid contract, "does not necessarily involve mental assent."  Hoeppner Const. Co. v. United States for Use of Trautman & Shreve, Inc., 273 F.2d 835, 837 (10th Cir. 1960).  Rather, "[t]he test of what a contract means is an objective one, based on what the parties said and did and the surrounding circumstances."  Gutierrez, 117 N.M. at 52 (Hartz, J., dissenting).[1]

---

[1] Judge Hartz's dissenting opinion in Gutierrez provides a valuable critique of the "much abused metaphor of 'meeting of the minds[,]'" as it is used in contract law, in short explaining that the phrase "creates problems because it can readily be interpreted to refer to the unconveyed thoughts of the parties.  As thus interpreted, the phrase leads to error in the application of contract law."  Gutierrez, 117 N.M. at 52 (Hartz, J., dissenting).  Judge Hartz goes on to note that the Restatement of Contracts avoids the use of "meeting of the minds," instead stating the general rule that "the formation of a contract requires a bargain in which there is a *manifestation* of mutual assent to the exchange and a consideration."  RESTATEMENT (SECOND) OF CONTRACTS § 17 (1981) (emphasis added).  "Manifestation of mutual assent" is used because "a mental reservation of a party to a bargain does not impair the obligation he purports to undertake."  Id. cmt. c.

In Hoeppner Constr. Co., a subcontractor received from the prime contractor a check in the amount of $5,435.43, with a notation on the back stating that "[e]ndorsement acknowledges payment in full of this contract."  Hoeppner Constr. Co., 273 F.2d at 836. Within ten days of having received the check, subcontractor wrote to prime contractor:

> This check is not acceptable to us and will not be received in full payment of this obligation, but will be applied on account.
>
> The amount claimed as due us under contract is $7,570.12.
>
> If our procedure in applying the amount received in this check on account is not rejected within ten days from receipt hereof, we will assume that this offer has been accepted by you.

Id.  When prime contractor failed to respond, subcontractor contacted its attorney, who advised that a cashing of the check would constitute an accord and satisfaction.  Having been so informed, subcontractor tried—over the course of approximately two months and without success—to reach prime contractor by telephone.  Subcontractor's attorney and an attorney for the surety then unsuccessfully attempted to reach a settlement.  Shortly before filing suit, subcontractor mailed the check back to prime contractor.  The envelope was returned to subcontractor, unopened.  Id.

The question presented to the Tenth Circuit was "whether the retention of the check by the subcontractor, under the facts and circumstances, constituted an assent."  Hoeppner Constr. Co., 273 F.2d at 837.  The Circuit acknowledged a range of authority on the retention-as-assent issue, noting varying holdings that (1) a creditor's retention for an unreasonable time of a check tendered in full payment of an unliquidated or disputed claim,

9

without cashing or otherwise using it and without indication of a refusal to accept the check in a satisfaction of his claim, consummates an accord and satisfaction; (2) mere retention of a check tendered in full payment of an unliquidated or disputed claim without any affirmative act or use does not result in an accord and satisfaction; (3) retention of a check tendered in settlement of a disputed or unliquidated claim does not result in an accord and satisfaction, where the creditor seasonably notifies the debtor that the check will not be accepted as full settlement; and (4) nonacceptance of a check tendered in full payment of a disputed or unliquidated claim may be negatived by affirmative acts of the creditor, notwithstanding his retention of the check.[2] Id. With respect to the narrow issue before it, however, the Circuit held:

> We are of the opinion that the facts in the instant case preclude a holding that the subcontractor assented to the offer. Here, the subcontractor, promptly on receipt of the check and the accompanying letter, advised the prime contractor by letter the check would not be accepted in full settlement of the claim, but would be applied on the account, unless the prime contractor objected to such application. The prime contractor did not respond to that letter, which affirmatively manifested the subcontractor's nonacceptance of the check on the basis it was tendered and expressed nonassent to an accord and satisfaction. Moreover, the subcontractor made no use of the check and exercised no dominion over it beyond mere retention. Furthermore, it made repeated efforts to contact the prime contractor to discuss the claim and check and it was unable so to do. Finally, it returned the check to the prime contractor's last known address and the envelope in which it was transmitted was

---

[2] But see Valley Asphalt, Inc., 3 Fed.Appx. at 840 ("[F]ederal precedent[] and commentators have all made clear retention of a check offered as payment in full constitutes assent to the accord and satisfaction even if the recipient of the check notifies the sender it is accepted only as a partial payment.").

>returned, not having been opened. The subcontractor also endeavored to effect a settlement with the surety.
>
>Not only was there notice of nonacceptance and nonassent, but affirmative acts thereafter culminating in an effort to return the check, manifesting nonassent to an accord and satisfaction.
>
>We conclude that there was no assent on the part of the subcontractor and, therefore, no accord and satisfaction.

Id. at 838.

Whereas the circumstances present in Hoeppner Const. Co. persuaded the Tenth Circuit that there was no accord and satisfaction, a review of the totality of the circumstances surrounding Mr. Lincoln's situation leads this Court to the opposite conclusion. See Gutierrez, 117 N.M. at 44 (permitting "an investigation into the surrounding circumstances" to determine parties' intent). First, Craig Cuthbert testified through his deposition that at no time prior to January 2005 did he have a conversation with Mr. Lincoln concerning a dispute about the replacement of his radiant heating system, nor did Mr. Lincoln dispute whether the claim had been resolved. Mr. Cuthbert additionally testified that during the claims process, Mr. Lincoln contacted him about the claim "pretty frequently." [Doc. 33; Exh. C, Cuthbert depo. at 93-94].

Within approximately six weeks of sustaining the damage, Mr. Lincoln wrote a letter to State Farm demanding payment of $16,912.27, minus his deductible, "for the damages in relation to claim # 31-B057-983." [Doc. 33 at 2-3]. In that letter, Mr. Lincoln wrote:

>Attached you will find a contract for an alternative heat system for $7800.00. That contract does not include the electrical work which I received a verbal bid from an electrical contractor for

11

>$600.00.  Total cost $8400.00.  *My agent led me to believe that this cost would be covered as this would be much more cost effective to State Farm than putting me back with what I had.*  My agent further called me late in the evening of the 12th of December to go ahead and line up the alternative heat system contractor.  State Farm should act in good faith and pay this or I will also pursue his errors and omissions.  I am also aware and can produce a policyholder from State Farm who had an exact sa[m]e loss and State Farm paid for an alternative heating system.

[Id. at 3 (emphasis added)].  Mr. Lincoln's letter does not request or even make mention of a new radiant heating system, nor does he suggest that the installation of the alternative heating system is meant to be a temporary fix.  To the contrary, the letter reasonably suggests that Mr. Lincoln and his insurance agent together made the decision to replace the radiant heating system with the forced air system, which certainly appears to have been an option under the terms of Mr. Lincoln's policy. [See Doc. 33; Exh. A, "Amendatory Endorsement" at ¶ A1 ("we will pay replacement[3] cost at the time of the loss of the damages part of the property. . . .").  Furthermore, through his deposition, Mr. Lincoln admitted that he did not request a new radiant heating system.  His explanation for failing to do so, however, was that "[a]t the time [he] was in shock." [Doc. 37; Exh. E, depo. of Tom Lincoln at 45].

      Craig Cuthbert also testified—and the transcript of the recorded telephone conversation confirms—that when he and Mr. Lincoln spoke about what State Farm was

---

[3] Merriam-Webster defines "replace" as "to restore to a former place or position[,] to take the place of especially as a substitute or successor[,] or to put something new in the place of."  Additionally, "[r]eplace . . . mean[s] to put out of a usual or proper place or into the place of another. *[R]eplace implies a filling of a place once occupied by something lost, destroyed, or no longer usable or adequate*."  http://www.merriam-webster.com/dictionary/replace (emphasis added).

12

willing to offer with respect to Mr. Lincoln's claim, Mr. Lincoln never asked for a replacement radiant heating system or the cost of such a system. [Doc. 33; Exh. C, Cuthbert depo. at 83; Exh. D, "Conversation 4 Tom & Craig"]. In fact, after Mr. Cuthbert detailed the expenses State Farm was going to reimburse, Mr. Lincoln stated that he "accept[ed] what [Mr. Cuthbert had] said for everything" and also confirmed that he was happy with State Farm. [Id.; Exh. D].

As he promised during their conversation, Craig Cuthbert then sent Mr. Lincoln a letter with a line-by-line breakdown of the payments State Farm was making on Claim # 31-B057-983. The letter, dated February 2, 2004, states, "Enclosed are two drafts *in settlement of your claim.*" [Doc. 33; Exh. E (emphasis added)]. It was not until nearly one year later, in a letter dated January 20, 2005, that Mr. Lincoln, fully acknowledging "receipt of the reimbursement costs that were paid to" him, nevertheless asserted that the alternative heating system was a "temporary repair[]." [Id.; Exh. H]. This is so, notwithstanding that in his letter of February 2, 2004, which stated that payment was being made "in settlement of [Mr. Lincoln's] claim[,]" Mr. Cuthbert instructed Mr. Lincoln to contact him with any questions. [Doc. 33; Exh. E, Feb. 2, 2004 letter from Craig Cuthbert to Tom Lincoln at 1 (emphasis added)]. Finally, Mr. Lincoln did not even compose his January 20th letter until six months *after* he had sold the property at 26 Shade Tree Lane. [See Doc. 33; Exh. G].

Given the totality of the circumstances, the Court concludes that a valid accord and satisfaction exists here. Mr. Lincoln does not appear to contest that there was a bona fide dispute over unliquidated Claim # 31-B057-983, or that State Farm tendered payment in full

settlement of the claimed amount. See Valley Asphalt, Inc., 3 Fed.Appx. at 841. He does, however, challenge the existence of the third and final element of the Valley Asphalt test in that he asserts that "[t]here is an issue of material fact as to whether State Farm's reimbursement to Plaintiff for costs he incurred installing an alternative (forced air) heating system *was accepted by Plaintiff* as full satisfaction for the debt or obligation owed." [Doc. 37 at 4 (italics added; underlining in original)]. This Court disagrees and instead concludes that the totality of the circumstances as set forth more fully above—*i.e.*, the initial demand that State Farm pay for an alternative heating system, the acceptance of payment offered in settlement of the claim and Mr. Lincoln's silence[4] in response to Mr. Cuthbert's instruction to contact him with any questions about the settlement, the sale of the property prior to making a request for the replacement of the radiant heating system, and the ultimate request for such replacement being made nearly one year after State Farm had tendered payment—is more than sufficient to create an objective manifestation of assent to a full and final settlement of Claim # 31-B057-983. For this reason, State Farm is entitled to summary judgment on the ground that Mr. Lincoln's claims are barred by the doctrine of accord and satisfaction.[5]

---

[4] The Court would note that this silence appears to have been in marked distinction to what Craig Cuthbert described as his "pretty frequent[]" conversations with Mr. Lincoln during the claims process. [See Doc. 33; Exh. C, Cuthbert depo. at 94].

[5] An accord and satisfaction operates to extinguish, discharge, or terminate an existing right, and thus supersedes the original demand. Bank United of Texas FSB, 49 Fed.Cl. at 3; 1 C.J.S. ACCORD AND SATISFACTION 64. Because a valid accord and satisfaction renders the original contract a nullity, this Court need not address the testimony of Plaintiff's purported expert John Sisneros as to what State Farm should have done under the terms of Mr. Lincoln's homeowners policy. See Doc. 37 at 3-5; Exh. A, Dec. 21, 2006 depo. of John Sisneros; see also

## III. CONCLUSION

As explained more fully above, this Court concludes that the claims as set forth in the *Complaint for Breach of Contract and Bad Faith Damages* are barred by the doctrine of accord and satisfaction. For that reason, summary judgment therefore will be entered in favor of Defendant State Farm.

**IT IS, THEREFORE, ORDERED** that *Defendant State Farm Fire and Casualty Company's Motion for Summary Judgment* [Doc. 32] is **GRANTED;**

**IT IS FURTHER ORDERED** that the Pretrial Conference set for Tuesday, July 1, 2008 at 9:00 a.m.; the Call of Calendar set for Thursday, August 7, 2008 at 9:00 a.m.; and the Jury Selection/Trial set for Monday, August 11, 2008 at 9:00 a.m. are hereby **VACATED**.

**SO ORDERED** this 22nd day of February, 2008, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

---

Merit Motors, Inc. v. Chrysler Corp., 569 F.2d 666, 673 (C.A.D.C. 1977) (summary judgment not precluded simply because opponent relies on expert testimony).